## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

BOARD OF EDUCATION OF
ALBUQUERQUE PUBLIC SCHOOLS,

      Plaintiff,

    v.                           No. 16-cv-1082 WJ/WPL

ROLANDA MAEZ and RICHARD
MONDRAGON, on behalf of M.M.,

      Defendant.

## MEMORANDUM OPINION AND ORDER REVERSING HEARING OFFICER'S FINAL DECISION ON IDEA APPEAL
## and
## ADVISING COUNSEL TO ADDRESS ANY REMAINING ISSUES

THIS MATTER is before the Court on Plaintiff Board of Education of Albuquerque Public Schools' ("APS" or "the District") appeal of an administrative decision pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2). APS seeks review and reversal of portions of the Final Decision in which the due process hearing officer ("DPHO") found APS denied student M.M. a free and appropriate public education ("FAPE") from August 15, 2015, until January 30, 2016.

## BACKGROUND[1]

This lawsuit centers on claims by Rolanda Maez and Richard Mondragon ("Parents") on behalf of their minor son, M.M., that APS failed to supply necessary special education and services to meet M.M.'s needs as a student with autism. Parents claim APS did not adequately

---

[1] The facts below are either the DPHO's findings from her August 31, 2016 Final Decision or they are facts established in the administrative record. Unless noted, the following facts are not disputed. Where feasible, the Court omits references to the transcript of the administrative hearing before the DPHO ("Tr.") for ease of reading.

address M.M.'s need for autism-based educational methodologies for the 2015–2016 school year.

## I.    Background

M.M. is a thirteen-year old student, and for his entire education he has been identified as having both global developmental delays and autism. He was evaluated by the UNM Center for Development and Disability ("UNMCDD") when he was three years old, and diagnosed with autism.[2] The UNMCDD Report noted M.M. is a child who has "dual diagnoses of global developmental delay and autism." Ex. 1 at 15. M.M. does not speak. He is not toilet trained. The record shows that he exhibits significant delays in cognitive abilities, sensory processing, communication, and daily living skills. M.M. has difficulty focusing and staying focused on academic tasks. He has a pattern of elopement in school, periodically running out the door of his classroom. The record notes he was fixated with doors and often ran to the same location near the doors of the school. He shows no awareness of danger.

M.M. attended Lyndon B. Johnson Middle School within APS for a portion of the 2015–2016 school year as a sixth grader until Parents withdrew him from school and then sued APS. The sixth grade year is the one at issue in this case. Parents assert M.M. was denied a FAPE during that school year both because M.M.'s Individualized Education Program ("IEP") was not reasonably calculated to enable him to make educational progress and because the special education services provided to him were not the research-based, peer-reviewed practices for students with autism necessary to allow him to benefit from his education.

By the end of fifth grade, M.M.'s speech and language pathologist ("SLP") noted M.M. made progress toward developing a communication system. The SLP explained M.M. could

_____

[2] A child with autism qualifies as a "[c]hild with a disability" under the IDEA. *See* § 1401(3)(A). The parties do not dispute that M.M. is entitled to the benefits of IDEA, including a FAPE provided by the District.

communicate what he wanted for a snack by using pictures and giving them to an adult. In fifth grade, M.M. was in a classroom with an Intensive Support Program ("ISP") as opposed to an Emerging Autism classroom. Though M.M. undoubtedly has autism, he was placed in the ISP class because the IEP team determined he needed attention to his global deficits. For example, in an Emerging Autism class, students have functional language and the classroom focuses on furthering that language. *See* Tr. 1128:24–1129:4. M.M. in contrast has no functional language.

In May 2015, a multi-disciplinary team ("MDT") summarized M.M.'s abilities and found IDEA eligibility based on autism. However, the May 18, 2015 IEP notes eligibility based on autism and intellectual disability. APS explained at the hearing that the addition of intellectual disability was a typographical error. The DPHO found the error did not negatively affect his educational services.

M.M. was again placed in an ISP classroom at the beginning of the 2015–2016 school year for sixth grade. He remained in the ISP classroom taught, by Bianca Lloyd, from August 15, 2015 until November 2, 2015, when he was transferred to another ISP room taught by Mihret Roman. On February 2, 2016, M.M. was assigned to a "hybrid" program where M.M. would spend two hours in the Emerging Autism class and continue in Ms. Roman's classroom for the remainder of the day.

Parents became unhappy with their son's education, and objected to his placement in the ISP classroom despite the fact that he was in an elementary ISP class the prior year. They insisted he should have been placed in an Emerging Autism program. Parents were concerned that the ISP teachers did not have the training and support from autism experts, and felt that M.M. needed a class that specifically served the needs of children with autism. The IEP team decided to test the "hybrid" program and evaluate which program better suited M.M.'s needs

after eight weeks. The evaluation never happened because on February 3, 2016, Parents withdrew M.M. from school after only two days in the "hybrid" program. Parents then provided M.M. with private, in-home clinical services, where the record indicates M.M. made educational progress that was acceptable to Parents.

## II.    May 18, 2015 IEP

M.M.'s May 8, 2015 IEP is the one at issue in this lawsuit. The 2015 IEP team[3] met and ultimately decided to place M.M. in an ISP classroom for sixth grade. The team completed a required checklist for students with autism, and checked "yes" to whether teaching strategies based on peer-reviewed practices were needed. The IEP did not include a statement or description of the peer-reviewed autism-specific methodologies needed by M.M. to make academic progress. The IEP team further noted that M.M. has behavioral issues that impede his learning, and the team agreed with Parents that a Functional Behavioral Assessment ("FBA")[4] and a Behavior Intervention Plan ("BIP") were necessary to address M.M.'s elopement issues and to ensure M.M.'s academic success and his safety.

Next, the IEP team decreased M.M.'s speech and language therapy ("SLT") from 720 minutes per semester to 600 minutes a semester. The IEP does not note a reason for the decrease in SLT. The IEP communication goal refers to using pictures or low-tech devices to answer questions. The IEP does not specify that the SLP chosen to work with M.M. must have knowledge of research-based strategies for non-speaking children with autism. The IEP did not require M.M.'s teachers to consult with the District's Autism Resource Team.

---

[3] The following IEP team members were present at the May 8, 2015 IEP meeting: Parents, Adapted PE Teacher Cheryl Goodale, District ISP Teachers Joan Jaecks and Bianca Llyod, Nurse Michelle Radden-Vogler, and Principal/Designee Kurt Schoenholzer.
[4] An FBA is done when a student's behavior interferes with his learning or the learning of others. Its purpose is to identify why a behavior is happening so that the IEP team can develop appropriate interventions. Ex. 30 at 1. The FBA should be prepared by those with direct knowledge of the student's functioning. Once the FBA is completed, the team may then develop a Behavior Intervention Plan (BIP) if appropriate. *Id.* On the FBA form, there is a section where the team may check a box if the student's behavior patterns suggest that a BIP is appropriate. *Id.* at 2.

### III.    DPHO's Findings and Basis for IDEA Appeal

On August 31, 2016, following a five-day administrative due process hearing, the DPHO issued her Final Decision and found M.M.'s May 18, 2015, IEP was not reasonably calculated to provide him some educational benefit and the services provided by APS pursuant to the IEP did not provide him with educational benefit.  Therefore, the DPHO concluded APS denied FAPE for five months, from August 15, 2015, until January 30, 2016.  APS partially appeals the DPHO's findings, which the Court sums up as follows.

The DPHO found M.M.'s IEP did not provide FAPE because APS failed to provide research-based, autism-specific special education and SLT services necessary for M.M. to make educational progress.  She found it inappropriate that M.M.'s ISP teacher used a teaching program for M.M. designed for students with global learning deficits rather than using exclusively a peer-reviewed program for children with autism.  She found the methodology required to support M.M. was Applied Behavior Analysis ("ABA"), which is an intensely focused, one-on-one program to increase or decrease behaviors that consists of direct observation, data collection, and functional analysis of that data.  The DPHO agreed with Michelle Monaghan, the Board Certified Behavior Analyst ("BCBA")[5] working privately with M.M., who testified that M.M. needs ABA to learn a new skill or extinguish a negative behavior.  Further, without ABA, M.M. does not make progress.

The DPHO also concluded that APS' failure to provide M.M. with the Functional Behavioral Assessment and Behavior Intervention Plan identified in his IEP interfered with the provision of appropriate educational services to M.M.  She found the absence on the IEP team of a person able to interpret the instructional implications of M.M.'s evaluation constituted a

---

[5] A BCBA is a graduate-level practitioner who has taken extensive course work, has completed supervision hours, and taken a Board exam.

procedural error under IDEA and denied FAPE. The DPHO specified that the absence of someone who could discuss the educational implications of M.M.'s autism contributed to the preparation of an IEP that was not reasonably calculated to enable M.M. to progress. Moreover, she found APS failed to adequately communicate with Parents thereby hampering their ability to fully participate in developing and modifying M.M.'s educational program, which also amounted to a procedural violation of IDEA.

With regards to M.M.'s communication goals, the DPHO found M.M. regressed from August 2015 to February 2016. She found the SLP who worked with M.M. from August 2015 to February 2016 had no training or expertise in working with students with autism. The SLP testified that she ignored M.M.'s autism in deciding how to work with him because she believed techniques she used with other children with language deficits would work for M.M. On November 2, 2016, an SLP with autism expertise who was a member of the District's Autism Resource Team visited M.M. in his classroom and expressed concern that M.M. had no functional communication system in place. She offered assistance to set up a system but M.M.'s teacher and SLP denied the offer.

Turning to M.M.'s elopement issues, the DPHO found APS erred by failing to complete the Functional Behavioral Assessment as identified in the May 2015 IEP. A Functional Behavioral Assessment was begun on October 29, 2015, but never finished. M.M. was placed into a new class on November 2, 2015, but still the FBA was not completed because his teacher did not have sufficient data regarding predicates to M.M.'s elopement behavior. The DPHO concluded that M.M.'s running behavior decreased, but it never went away.

The DPHO focused on Ms. Lloyd's class and found her instruction was not reasonably calculated to enable him to make progress toward his IEP goals and that M.M. did not make any

progress.  The DPHO found that M.M. did not fit perfectly in either the Intensive Support Program class or the Emerging Autism class and that either choice would have been acceptable.  However, the DPHO concluded it was not acceptable that APS failed to provide autism-specific methodologies needed by M.M. to make even some progress, regardless of the classroom, teacher, or program being used with other students in the class.  The DPHO did not, however, identify any goals in the 2015 IEP that she found were inappropriate.

## LEGAL STANDARD

### I.   IDEA

The IDEA is a comprehensive educational scheme focused on the rights of disabled children to a FAPE designed to meet their unique needs.  *See* 20 U.S.C. § 1400; *see also L.B. ex rel. K.B. v. Nebo School Dist.*, 379 F.3d 966, 973 (10th Cir. 2004).  IDEA "offers States federal funds to assist in educating children with disabilities.  In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a free appropriate public education—a FAPE, for short—to all eligible children." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017) (internal citations omitted).  To provide an IDEA-eligible child with a FAPE, a school district must create an IEP for the child and follow its components.  An IEP is a "written statement for each child with a disability that is developed, reviewed, and revised" in accordance with the IDEA.  20 U.S.C. § 1414(d)(1)(A)(i).  A student's IEP must be "reasonably calculated to enable [him] to receive educational benefits," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982); *see also Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008).  The IEP must be "individually designed" to suit the needs of each particular child.  *Rowley*, 458 U.S. at 201.

"When a dispute reaches federal court, the court applies a two-step analysis based on [IDEA's] dual emphasis on substance and procedure. First, the court determines whether the IEP development process complied with [IDEA's] procedures. Second, the court evaluates whether the IEP's substance provided the student with a FAPE. If the IEP satisfies both steps, then the school district has complied with the Act." *Sytsema ex rel. Sytsema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1312–13 (10th Cir. 2008) (internal citations omitted) (alteration added). "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999 (quoting *Rowley*, 458 U.S. at 206–07) (emphasis in original).

## II.     Burden of Proof

The parties disagree as to who bears the burden of proof in this appeal. The Court finds that APS, as the plaintiff in this action, bears the burden of persuasion that the DPHO's decision should be reversed. *See Jefferson Cty. Sch. Dist. R-1 v. Elizabeth E. ex rel. Roxanne B.*, 798 F. Supp. 2d 1177, 1183 (D. Colo. 2011). However, regarding the burden of production, it is Parents' burden to show the IEP did not provide M.M. with a FAPE. The United States Supreme Court in *Endrew F.* did not alter the burden of proof in IDEA matters; the party challenging the IEP must show it was deficient. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005) (holding that the party challenging an IEP in a due process hearing bears the burden of proof); *see also Johnson v. Indep. Sch. Dist. No. 4 of Bixby, Tulsa County, Okla.*, 921 F.2d 1022, 1026 (10th Cir. 1990) (the party attacking a student's IEP bears the burden of proof to show why the IEP is inadequate or did not provide the child with educational benefit). IDEA creates a "'presumption in favor of the educational placement established by' " [the child's IEP], and "'the party attacking its terms should bear the burden of showing why the educational setting

established by the [IEP] is not appropriate.'" *Id.* (quoting *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1158 (5th Cir. 1986)). Ultimately, this Court's task is to determine whether a preponderance of the evidence shows the DPHO's final decision should be reversed. *See Sytsema*, 538 F.3d at 1311.

### III. Standard of Review

Unlike the deferential review typically afforded to administrative adjudication of statutory claims, Congress requires district courts to apply a modified *de novo* standard when reviewing agency disposition in the IDEA context. *See* 20 U.S.C. § 1415(i)(2)(C); *Garcia*, 520 F.3d at 1125 (quoting *Murray v. Montrose County Sch. Dist.*, 51 F.3d 921, 927 (10th Cir. 1995)). Although unique, the modified *de novo* standard of review nonetheless comports with the Tenth Circuit's general deference to an administrative tribunal as to findings of fact turning on the credibility of evidence. *See Adams ex rel. D.J.W. v. Astrue*, 659 F.3d 1297, 1302 (10th Cir. 2011) (credibility determinations are "peculiarly the province of the finder of fact" and are upheld "when supported by substantial evidence" in the record, provided that the determinations are "closely and affirmatively linked" to that evidence). Specifically, the district court must (1) receive the record of the administrative proceedings, (2) hear additional evidence at the request of a party, and (3) base its decision on the preponderance of evidence. 20 U.S.C. §1415(i)(2)(C). At the same time, though the statute specifies that review is *de novo*, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that "due weight" must be given to the administrative proceedings, the fact findings of which are "considered prima facie correct." *Rowley*, 458 U.S. at176; *Garcia,* 520 F.3d at 1125 (quoting *Nebo Sch. Dist.*, 379 F.3d at 974.

### DISCUSSION

In this Memorandum Opinion and Order, the Court considers whether to reverse the Final Decision by the DPHO, as APS seeks, or to grant the relief sought by Parents, which is to enter judgment against APS on the IDEA claims. In this appeal, APS argues the DPHO's findings are flawed and not supported by a preponderance of the evidence. APS asserts the DPHO engaged in improper burden-shifting by requiring APS to prove its programming was appropriate rather than requiring Parents demonstrate by a preponderance of the evidence that the IEP and its implementation were *in*appropriate. The Court has carefully reviewed the administrative record, and for the reasons that follow, the Court concludes that the preponderance of the evidence shows M.M. made some meaningful progress relative to the severity of his disabilities and the IEP was reasonably calculated to enable M.M. to progress in light of his combination of disabilities. *See Endrew F.*, 137 S. Ct. at 999. Accordingly, the Final Decision is reversed. Because the Court finds in favor of APS, and vacates the DPHO's ordered remedy, the Court need not reach APS' alternative argument that to the extent a remedy for Parents is nonetheless appropriate, the DPHO exceeded her authority. *See infra* § VI.

**I.    Implementation of ABA Methodology**

At its core, the dispute regarding ABA turns on whether APS must provide M.M. with a strict ABA methodology or whether APS may provide a classroom program that incorporates ABA principles. APS asserts M.M.'s autism as well as his global developmental delays have always been considered when deciding what placement best suits his educational needs and when developing his May 2015 IEP. The DPHO found that APS failed to document autism-based strategies in the May 2015 IEP and that APS failed to use ABA. APS argues the DPHO erred in finding M.M. must receive a strict ABA methodology to have a FAPE and she failed to recognize that autism-based interventions can be provided to students under different programs.

APS further asserts the DPHO did not consider evidence that ABA is not the only way to provide autism-specific interventions in school. Moreover, even if ABA was the only way to provide autism-specific interventions in the classroom, the preponderance of the evidence shows APS was implementing some ABA techniques in M.M.'s classroom.

Next, APS argues the DPHO overlooked evidence in the record and throughout the IEP that shows the IEP team did consider M.M.'s autism-related needs and appropriate strategies, including components of ABA. The DPHO took issue with the fact that M.M.'s teacher used a teaching program for children with global learning deficits rather than a peer-reviewed program for autistic children, but the DPHO ignored the evidence in the record that M.M. is affected by global deficits and that autism alone cannot explain his challenges. APS emphasizes that the Center for Development and Disability Report states that while autism is the appropriate diagnosis for M.M., "it is important to note that his cognitive delays are of a serious concern" and that M.M. "has many behaviors typically seen in autism … However, this alone cannot explain the presence of his very significant and global developmental delays and both the presence of autism and his global developmental delays warrant attention and intensive intervention." Ex. 1 at 5, 10. APS points out that M.M. was, and always has been, identified as a child with "dual diagnoses of global developmental delay and autism" and would benefit from not only autism-supports but "a comprehensive program to address" his global developmental delay deficits. *Id.* at 11, 15. APS contends the DPHO improperly dismissed evidence that M.M.'s significant global developmental delays form a part of his unique needs and warrant attention and intervention as well as his autism diagnosis.

Finally, APS contends that choice of an educational methodology is reserved for the school district. *Rowley*, 458 U.S. at 208. "Parents—no matter how well motivated—do not have

a right under IDEA to compel the school district to provide a specific program or employ a specific methodology for the education of their disabled child." *Logue By & Through Logue v. Shawnee Mission Pub. Sch. Unified Sch. Dist. No. 512*, 959 F. Supp. 1338, 1351 (D. Kan. 1997). APS asserts the DPHO had no right to require it to include ABA methodologies in the IEP. Nonetheless, the DPHO ignored evidence that the IEP team did consider M.M.'s autism-related needs and that M.M.'s teachers were utilizing ABA techniques.

Parents wholly disagree, arguing ABA is the only acceptable methodology to address M.M.'s needs and that APS ignored evidence-based autism practices during the 2015 to 2016 school year. Parents assert that M.M. has never been determined to have any other IDEA eligibility other than autism, so he needs a strict ABA program. Parents point out that M.M. responded well to ABA in the past. They rely on the testimony of Ms. Monaghan, their in-home private Board Certified Behavior Analyst, who testified at the hearing that only ABA will work for M.M. Parents state APS never had M.M. evaluated[6] and they take issue with the fact that in May 2015 APS inserted "intellectual disability" into the IEP and admitted it was a typographical error. However, the DPHO already found the typographical error did not negatively affect M.M.'s educational services in any way, Parents did not appeal this finding and so the reference to this typographical error by counsel for Parents in the pleadings is of no consequence.

The Court finds that the administrative record shows M.M.'s May 2015 IEP did incorporate ABA strategies and that his teachers used ABA techniques. The DPHO erred by failing to consider any evidence in this regard, particularly that a strict ABA program is not the only way to provide autism-specific interventions in the classroom setting. Even if APS did not utilize ABA techniques, the choice of educational methodology is reserved for the school

---

[6] The APS MDT team did in fact evaluate M.M. in 2015, and as explained above the MDT found he was eligible for special education services as a student with autism. Moreover, Parents declined to have M.M. evaluated for a disability other than autism because they did not see the purpose in doing so.

district.  The May 2015 IEP does not support Parents' contention that APS "ignored" M.M.'s needs as a student with autism.  For example, the record shows instances where M.M.'s needs as an autistic student were considered because the 2015 IEP contains a section that describes the autism-focused services that would be provided to M.M.  *See* Ex. 28 at 16.  The Court concludes the weight of evidence from the administrative record indicates autism alone cannot explain M.M.'s challenges.  The Final Decision does not demonstrate that the DPHO weighed any evidence in this regard, so the Court reverses the DPHO's finding that M.M. must have received exclusively an ABA methodology to receive FAPE.

Labels do not drive the IEP, student need does so.  *See Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th Cir. 1997).  The preponderance of the evidence does not show APS ignored M.M.'s autism, but rather the District considered his autism in light of his other global delays and crafted an IEP around M.M.'s unique abilities and limitations.  "A focus on the particular child is at the core of the IDEA … An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Endrew F.*, 137 S. Ct. at 999 (quoting §§ 1414(d)(1)(A)(i)(I)–(IV), (d)(3)(A)(i)–(iv)).

For example, the UNM team that initially diagnosed M.M. with autism noted that autism alone cannot explain the presence of his very significant and global developmental delays and both the presence of autism and his global developmental delays warrant attention and intensive intervention.  *See* Ex. 1 at 5, 10.  The UNM Report does not specify that ABA must be used, and APS introduced evidence at the hearing from The National Professional Development Center on Autism Spectrum Disorder that discusses evidence-based practices for autism spectrum disorder and lists several dozen non-ABA strategies.  *See* Ex. 53 at 1–2; Tr. 1353: 5–10.  Also, evidence shows the IEP team in May 2015 did consider the need for teaching strategies based on M.M.'s

autism. *See* Ex. 28 at 16; Doc. 25-1 (documentation of autism considerations in the May 2015 IEP).

Moreover, at the hearing, APS' expert BCBA Jennifer Bossow testified that it is not appropriate to use ABA as the exclusive methodology in the classroom setting where there are distractions and interruptions (as opposed to the private, in-home setting). *See* Tr. 1343:18–25, 1351–1352; *see also* Tr. 656:6–13. Ms. Bossow agreed that M.M. required research-based, autism-specific strategies in order to make progress, but she emphasized that although ABA strategies have been shown to work with children with autism, a school day for M.M. must include both ABA and other techniques as well. *See* Tr. 1352, 1386. She also explained that evidence-based practices include methodologies other than ABA. *Id.* at 1353. In reaching her conclusions, the DPHO did not balance Ms. Monaghan's testimony with that of Ms. Bossow. The progress M.M. made under the in-home BCBA is not the appropriate measure of whether the services M.M. was receiving by APS were inappropriate. Ms. Monaghan used ABA exclusively, but this was done in the context of his home, not the classroom setting. Although Ms. Monaghan explained that M.M. needed intensive ABA in order to learn, she also admitted she is not a classroom teacher and instead works exclusively in the private setting.

Even if choice of methodology was not left to the District, there was testimony that both of M.M.'s sixth grade teachers did incorporate ABA strategies and use such strategies appropriately. *See* Tr. 1345:23–1346:4. The Court agrees with APS that the evidence in the record demonstrates M.M. was receiving both types of supports in the ISP classrooms—evidence the DPHO did not discuss in her Final Decision. The record does not support the DPHO's determination that APS failed to document autism-based strategies, and the record actually reveals that APS was implementing specific ABA strategies. *See* Tr. 39:1–2 (Ms. Lloyd stated

she used ABA techniques in teaching M.M.); Tr. 1371:16–1372:10 (Ms. Lloyd[7] appropriately used autism-based strategies with M.M. in the classroom); Tr. 1361:8–9 (Ms. Roman used ABA strategies in her classroom); Tr. 1375:1–10 (teachers utilizing cause and effect toys to engage M.M. and to provide different reinforcements was another ABA strategy). The DPHO did not carefully or thoroughly consider this evidence, so the Court finds her conclusions regarding ABA were flawed. *See R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist. [R.B.]*, 496 F.3d 932, 942 (9th Cir. 2007) (a hearing officer's findings are careful and thorough when the hearing officer recounts a complete factual background as well as a discrete analysis).

A school district is not required to offer and implement the particular program and services preferred by a parent. *See Rowley*, 458 U.S. at 207. "IDEA cannot and does not promise "any particular [educational] outcome."" *Endrew F.*, 137 S. Ct. at 998 (quoting *Rowley*, 458 U.S. at 192). Questions of methodology must be left to the school district. *See Rowley*, 458 U.S. at 208. Moreover, although IDEA requires every IEP to contain a statement of the special education services, based on peer-reviewed research to the extent practicable, IDEA does not require the IEP to disclose a specific educational methodology and obligates schools to implement research-based teaching methods only "to the extent practicable."[8] 20 U.S.C. § 1414(d)(1)(A)(i)(IV); *see also* 20 U.S.C. § 1414(d)(1)(A)(ii)(I) (stating that the IDEA shall not be construed to require "that additional information be included in a child's IEP beyond what is explicitly required in this section").

The record in its entirety indicates that the May 2015 IEP incorporated numerous teaching techniques, including ABA, which in total were appropriately ambitious and likely to

---

[7] Ms. Lloyd has specific education and training in ABA. *See* Tr. 25:21–25; 25:1–12; 38:8–13.

[8] The U.S. Department of Education rejected requiring schools to utilize research-based teaching methods, recognizing that "there is nothing in the [IDEA] that requires all programs provided to children with disabilities to be research-based with demonstrated effectiveness in addressing the particular needs of a child where not practicable." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 276–77 (3d Cir. 2012) (quoting 71 Fed. Reg. at 46,665).

provide M.M. with some educational benefit in light of his unique circumstances. *See Endrew F.*, 137 S. Ct. at 999; *Sytsema*, 538 F.3d at 1317. The Court concludes APS employed acceptable methodologies that took into account M.M.'s needs as a student with autism as well as his other significant global learning disabilities, and properly designed an IEP around these complex needs. While Parents may have wanted more for their son, the law did not require APS to do more than it did for M.M. *See Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (emphasis in the original) (federal law "does not secure the best education money can buy; it calls upon government, more modestly, to provide an appropriate education.").

## II.      Fifth Grade IEP vs. May 2015 IEP

Next, APS asserts the May 2015 IEP was reasonably calculated to enable M.M. to make educational progress, which is evident by the fact that the sixth grade IEP is nearly identical to the fifth grade IEP. Both parties agree M.M. made meaningful progress in fifth grade, and the DPHO likewise concluded that by the end of fifth grade, M.M. could communicate consistently using pictures. APS contends M.M.'s fifth grade IEP is virtually the same as the sixth grade IEP at issue in this case. *See* Ex. 24 at 33–34 (fifth grade IEP); Ex. 28 at 17–18 (sixth grade IEP). APS argues the only difference between the two IEPs is the reduction in SLT from 720 minutes per semester to 600 minutes per semester. APS points out the fifth grade IEP did not document the types of methodologies that the DPHO demands to see in this case, so her determination that the May 2015 IEP is flawed is not supported by a preponderance of the evidence.

Parents respond that the fifth grade IEP contains documentation of necessary strategies for M.M. as a student with autism, unlike the May 2015 IEP, which reveals the way in which the 2015 IEP is flawed in that APS failed to specify ABA methodology.

The Court finds that given the objective evidence in the administrative record of M.M.'s successful progression under his fifth grade IEP, the May 2015 IEP was reasonably *calculated* to enable M.M. to receive educational benefits in light of his disabilities, even if it did not specify ABA methodology. M.M.'s progress under the fifth grade IEP is not dispositive of whether his 2015 IEP was reasonably calculated to confer educational benefit, but the fact that the parties agree M.M. progressed under the fifth grade IEP strongly suggests that the 2015 IEP at issue was reasonably calculated to continue the trend of progression. *See Endrew F.*, 137 S. Ct. at 999 ("To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."). While it is true the May 2015 IEP does not specifically name ABA as the methodology, as the Court discussed at length in the preceding section, the IEP document shows a list of autism considerations that were considered for M.M. *See* Ex. 28 at 16. The IEP documented a number of teaching strategies based on peer-reviewed and/or research-based practices. *Id.* at 4, 6–8. Most importantly, the parties do not dispute that M.M. made meaningful progress in fifth grade both in terms of communication and participating in class activities, so there is a compelling reason to believe the similar sixth-grade IEP was likewise properly calculated. *See* Ex. 27 at 6; Ex. 27 at 4. Critically, the DPHO did not identify one goal in the May 2015 IEP that she found to be inappropriate.

The DPHO relied on *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105 (9th Cir. 2016), for her proposition that the May 2015 IEP was missing critical elements regarding autism, which denied a FAPE to M.M. The Court agrees with APS that the DPHO's reliance on *Timothy O.* is inapposite because there, the school district had not assessed the student with autism in the first place. *See* 822 F.3d at 1124–25. The school district's failure to diagnose the

student with autism meant that the goals in his IEP were inappropriate because "they were made without sufficient evaluative information about [his] individual capabilities as an autistic child." *Id.* at 1124. In contrast here, M.M. was identified as a student with autism eligibility under IDEA, and APS has known for M.M.'s entire education that he has been identified as a student with autism as well as global developmental delay. *See* Ex. 1. Parents do not claim M.M. was mislabeled or found eligible for IDEA under the wrong disability. Parents argue APS did not understand M.M.'s needs as a student with autism, but the record is replete with evidence that M.M. suffers from severe autism *as well as* developmental delays that impact virtually every aspect of his daily living. As the Court has already discussed at length, APS utilized autism-based strategies in conjunction with other methodologies to address M.M.'s unique needs and determine the best placement for him. *See Endrew F.*, 137 S. Ct. at 999.

Finally, APS argues the DPHO erroneously found that the lack of an autism expert at the May 2015 IEP meeting constituted a procedural violation of IDEA that deprived M.M. of a FAPE. Parents contend that because no teacher from the school's autism-specific program classrooms attended M.M.'s IEP on May 8, 2015, no one could explain the instructional implications to the IEP team. *See* Ex. 28 at 15. However, as the DPHO herself noted, the law governing the composition of the IEP team does not require that an autism expert participate in each IEP involving a child with autism. 34 C.F.R. § 300.321(a)(5); 20 U.S.C. § 1414(d)(B)(iv)(I). Furthermore, the record shows that there was in fact an IEP team member who had the capacity to explain the instructional implications of M.M.'s evaluation to the IEP team. District ISP Teacher Joan Jaecks, who attended the IEP, was an autism-specific teacher for M.M. in the previous year, so certainly Ms. Jaecks had the ability to provide the necessary information. Tr. 901:13–20. Therefore, the Court finds the lack of a teacher from one of the

school's autism-specific program classrooms at the 2015 IEP did not violate IDEA's procedures and did not deprive FAPE to M.M.

### III.   Decrease in Speech Language Therapy and M.M.'s Communication Progress

APS maintains that the 120-minute per semester decrease in M.M.'s Speech Language Therapy ("SLT") was not arbitrary, and that M.M. had as much of a functional communication system in place as he could tolerate.  Parents respond that communication is a core deficit of a child with autism, and APS did nothing to address M.M.'s need to develop a functional method of communicating in school.  Based on the way the parties have briefed these issues, the Court considers them in turn.

#### A.   Decrease in SLT

APS argues there is no evidence in the record to support Parents' contention that the decrease in M.M.'s SLT from 720 to 600 minutes per semester denied a FAPE to M.M.  APS maintains that the DPHO ignored the text of the May 2015 IEP and based her finding on the testimony of one witness who stated she could not recall if the decrease in SLT was ever discussed.  *See* Tr. 65–66.  APS contends this does not constitute a proper finding by a preponderance of the evidence that the decrease in SLT harmed M.M.

Furthermore, APS asserts Parents did not introduce any expert evidence concerning what M.M. needed in terms of minutes of SLT.  APS further argues that the DPHO ignored the portions of the IEP that show why the decrease from 720 to 600 minutes was implemented in 2015, which was to account for the goal to have M.M. learn communication skills with the classroom teacher as opposed to exclusively with the SLP.

In response, Parents contend the decrease in SLT was "done for no reason at all" and deprived M.M. of a FAPE.  Parents point out that when the SLP who was a member of the

school's Autism Resource Team observed M.M. in his classroom in November 2015, she did not see any way for him to communicate, and communication is a core deficit of a child with autism. Parents also take issue with the fact that APS used the same language to justify the amount of SLT from 2014 as it did in 2015.[9] In sum, because the May 2015 contains no justification for the decrease in SLT, the reduction was arbitrary and deprived M.M. of a FAPE.

The Court finds the DPHO's conclusion that the decrease in SLT denied FAPE is flawed, and should be reversed. In reaching her conclusion, the DPHO improperly placed the burden of proof on APS to disprove Parents' allegation that the decrease in SLT, standing alone, violated IDEA. *See Schaffer*, 546 U.S. at 62. The DPHO did not base her finding on the preponderance of the evidence, but rather on the testimony of a single witness, Ms. Lloyd, who simply testified that she could not recall if the decrease was ever discussed. *See* Tr. 65–66.

Parents rely on the testimony of Kurt Schoenholzer, the head special education teacher at M.M.'s school, who testified that he could not say "why hours or times would be reduced or even increased," in order to show that the reduction was arbitrary. Tr. 549:11–12. However, the context of Mr. Schoenholzer's statement shows that he stated he would not know *why* SLT times would be decreased because he is not an SLP. Tr. 549:10. In fact, Mr. Schoenholzer stated that any reduction *would* in fact be discussed at an IEP meeting. 549:16. The DPHO did not balance this testimony at all. The fact that Ms. Lloyd could not recall whether a reduction in SLT was discussed at the IEP meeting does not show, by a preponderance of the evidence, that any reduction in SLT was unjustified, especially in light of another witness explaining that such a change would be discussed. Furthermore, Parents presented no evidence as to how the reduction harmed their son, and they presented no expert testimony as to how much SLT he required. In

---

[9] APS stated "[t]o address M.M.'s delays in expressive, repetitive and social communication" for the 720 minutes of SLT as well as for the 600 minutes of SLT. *See* Ex. 28 at 17, 18.

fact, the DPHO failed to consider that the 2015 IEP did reveal why the SLT decrease occurred and the Court finds the decrease is not arbitrary and is supported by the evidence in the record. A review of the speech and language goals from M.M.'s 2014 and 2015 IEPs shows that in May 2015, the IEP team gave M.M.'s classroom teacher the duty to support M.M.'s expressive and receptive language goal. Ex. 28 at 6 (SLP and teacher to measure progress). In contrast, in 2014 the SLP was exclusively responsible for supporting M.M.'s expressive and receptive language goal. Ex. 24 at 6 (IEP explaining the progress is to be measured by the SLP). As APS highlights, Parents own expert explained at the hearing that M.M. needed to practice expressive and receptive language skills in the classroom with his teacher rather than solely with the SLP. *See* Tr. 665:21–666:7. Thus, the Court concludes the reduction in M.M.'s SLT from 720 to 600 minutes per semester makes sense in light of the 2015 IEP speech and language goals and in light of the evidence in the record showing the ultimate goal of M.M. practicing his language goals in the classroom instead of exclusively with the SLP. Under *Endrew F.*, APS has provided a "cogent and responsive explanation" for the decrease in SLT. *See* 137 S. Ct. at 1002. *See Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 277 (3d Cir. 2012) ("under the IDEA, courts must accord significant deference to the choices made by school officials as to what constitutes an appropriate program for each student").

### B. Functional Communication System

Next, APS asserts the DPHO improperly overlooked evidence that M.M.'s educational team was working on developing a communication system and that M.M. was making progress in learning Picture Exchange Communication System.[10] Moreover, he was able to communicate physically using gestures. APS also points out that M.M.'s parents withdrew him from school

---

[10] PECS is a system where a child learns to communicate by exchanging a picture of an item for the actual item. Tr. 707:22–25.

before giving the District a chance to see if its educational strategies were successful. APS contends M.M.'s global developmental delays make him different from other students with autism, so teaching him communication skills is inherently inconsistent. As M.M.'s own private therapist testified, M.M. needs more help than other students, has lower functioning levels than other children with autism, and takes a considerable amount of time to learn a new skill. *See* Tr. 710:5–12; 712:5–12; 714:2–25. M.M. is not like other students with autism who can sit and complete a task without an adult sitting alongside him, therefore his unique challenges made it more difficult for him to learn to communicate. *See* Tr. 507:10–19.

The preponderance of the evidence shows the communication goals and strategies in place for M.M. were appropriately ambitious in light of his unique circumstances, which made it more difficult for M.M. to learn than other students with autism. The DPHO did not consider the evidence in the record that M.M.'s educational team was working to develop Picture Exchange Communication System in M.M.'s ISP classroom. The DPHO did not thoroughly consider the complete factual circumstances here, where M.M. is not a typical child with autism. He requires significantly more time to learn a new skill, and his educational progress could be inconsistent even with his private, in-home BCBA. Under *Endrew F.*, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S. Ct. at 1001. For example, the DPHO did not address evidence that M.M. is unlike a typical child with autism in that he had no functional language system to begin with. *See* Tr. 507:10–19; 1128:24–1129:8. Moreover, unlike other children with autism who could sit for brief periods of time and complete a task without assistance, M.M. could not do so. Tr. 507:10–19. The record shows the educational team was taking into account M.M.'s global delays as well as his autism in the ISP classroom. APS had educators in place for M.M. who had the ability to address his

communication needs. *See id.*; *see also* Ex. 33 at 1 (APS SLP explaining M.M.'s ISP teacher had experience and training in Picture Exchange Communication System to address M.M.'s needs and that PECS would be a good fit for M.M. in the ISP class). Ms. Monaghan even explained that M.M. needs more help than other students with autism. Tr. 714:2–25; Tr. 512:13–16. The record as a whole does not show that combining Picture Exchange Communication System with the other educational techniques APS took into consideration would have rendered M.M.'s IEP inappropriate. As Ms. Monaghan and Ms. Bossow confirmed, M.M.'s progress in developing communication skills would necessarily be slow or inconsistent based on his unique needs. The DPHO did not weigh the evidence in this regard.

There is evidence M.M. was making some progress in light of his combination of disabilities in the ISP classroom in learning to use Picture Exchange Communication System. At the time, M.M.'s teachers knew he was in the "discrimination phase" of learning how to communicate, which meant that he needed pictures of objects in order to communicate.[11] APS created picture cards for him. *See* Tr. 303:10–307:25; 944:14–17; 1250:1–1254:25; 1373:13–23 (Ms. Bossow explaining that M.M. was learning to use PECS). M.M. was learning to use a visual schedule. *See* Tr. 1253:17–1254:17. Ms. Bossow also testified that in her experience with students with autism, communication progress will necessarily ebb and flow. Tr. 1375:19–23.

Thus, the Court concludes that the preponderance of the evidence in the administrative record shows the communication goals and methodologies in the 2015 IEP were appropriately ambitious for M.M. in light of his unique circumstances where he required significantly long periods of time to learn and had made inconsistent progress with Picture Exchange Communication System in the past with his private instructor. APS was working on developing

---

[11] Ms. Monaghan explained that the discrimination phase of Picture Exchange Communication System refers to a child's ability to choose between two different pictures in order to know what one of the pictures means and to use the picture to communicate a want or a need. Tr. 639:22–640:8.

a functional communication system for M.M. in his ISP classroom, and the record shows his teacher was qualified and experienced to implement such a system.

## IV. Elopement

The dispute regarding M.M.'s elopement behavior boils down to the following: APS states the elopement was almost entirely extinguished by the time Parents removed M.M. from school, which shows APS was on its way to successfully remedying the behavior. Parents argue APS failed to complete the Functional Behavioral Assessment and Behavior Intervention Plan requested in the IEP, which meant there was no effective approach taken by APS staff to completely eradicate M.M.'s elopement.

At the hearing, APS elicited testimony from four APS staff members—three of whom worked with M.M. on a daily basis, and one of whom was APS' expert, Ms. Bossow—that elopement behavior had greatly diminished by the time Parents pulled M.M. out of school. The DPHO found one of these witnesses to lack credibility, but she disregarded the other three, including the expert. According to APS, the DPHO crafted her remedy based on an apparent belief that M.M. was running from the classroom 18 to 30 times per day, when there was evidence the 18 to 30 instances pertained to the beginning of the school year only. In short, APS argues the preponderance of the evidence shows that M.M.'s elopement behavior had dramatically decreased by the end of the school year, and to find otherwise the DPHO improperly ignored ample evidence in the record.

Parents respond that APS' failure to complete the Functional Behavioral Assessment and Behavior Intervention Plan that the IEP determined were necessary to address M.M.'s habit of running out the classroom door impeded his learning. Parents contend that regardless of whether M.M.'s elopement was nearly extinguished by January of 2016, it continued to happen and was

inherently dangerous because there was no uniform or effective approach taken to address the behavior by APS.

The Court finds that the weight of the evidence from the administrative record shows M.M.'s elopement behavior was almost entirely gone by the beginning of February 2016, when his parents pulled him out of school. Here again, the Court agrees with APS that the DPHO applied the wrong burden of proof in demanding that APS disprove Parents allegations that APS violated IDEA. The administrative record shows the DPHO did not consider any testimony from the APS staff members, including Ms. Bossow who the DPHO found credible, that M.M.'s elopement was almost extinguished before Parents withdrew him from school. Even ignoring the testimony from the witness who the DPHO found to lack credibility, the great weight of the evidence shows that by the middle of the year, M.M.'s elopement was nowhere near where it was at the beginning of the school year.

On October 29, 2015, a Functional Behavioral Assessment was initiated by Ms. Lloyd, but it was never completed. *See* Ex. 30. The Assessment identified M.M.'s problem behavior as jumping out of his desk and running out the classroom door 3–5 times each class period in an attempt to exit the school building (up to 30 times per day). *See* Tr. 88:13–22. When M.M. was told "no" he would spit or scream. *Id.* at 1. The FBA noted that transition times, academic activity, and unstructured settings typically preceded the problem behavior. *Id.* The consequences of limiting privileges (such as games) or pointing to a stop sign and saying "stop" were noted to be very effective ways of dealing with the behavior. *Id.* at 2. The FBA noted that "existing data is insufficient for a complete functional assessment." *Id.* This evidence shows the interventions were working to remedy M.M.'s running behavior.

Moreover, the evidence shows a Behavior Intervention Plan was not completed for M.M. because a BIP is needed only when a problem behavior has continued to interfere with a student's learning, and Ms. Lloyd explained she did not complete a Behavior Intervention Plan because the running behavior was decreasing, which meant the interventions were working.  Tr. 86:20–24; *see also* 1364:7–1365:20.

Ms. Bossow explained at the hearing that M.M.'s ISP teachers were using appropriate interventions to eradicate M.M.'s elopement behavior.    Tr. 1382:10–16;  1469:18–25. Specifically, changing the environment or using the visual boundary of stop were two successful techniques.  *Id.*  Ms. Bossow noted there were "zero" incidents of elopement happening by the time M.M. was removed from school.  Tr. 1364:15–21.  Although Ms. Bossow testified that tally marks to record the number of times M.M. left the classroom were not the type of data that would be used for an FBA (Tr. 1381:11–14), the point of her testimony is that M.M.'s elopement had all but vanished by the middle of the school year.  The DPHO found Ms. Bossow to be a credible witness, yet the DPHO failed to consider any of Ms. Bossow's testimony that M.M.'s elopement behavior was essentially gone by the time Parents withdrew M.M. from school.

Parents claim that Ms. Bossow "rejected" the way M.M.'s teacher was addressing elopement, but this contention misstates the evidence.  Ms. Bossow actually explained that although she would not implement the visual support of a stop sign to stop elopement behavior, Tr. 1468:14–22, "based on the data" M.M. *did* stop running out of the classroom and his teachers "were teaching him how to respond to the visual support of the" stop sign on the floor.  Tr. 1469:18–25.  Furthermore, the record is replete with evidence that APS staff was analyzing the cause of M.M.'s elopement and were working to develop interventions and replacement behaviors.  For example, APS learned M.M. was fixated on watching doors opening and closing,

so APS worked to address this fascination with replacement methods of capturing M.M.'s interest. Tr. 82:11–22; 1381:25–1382:16; 158:7–16; 1469:18–25.

Ms. Roman also testified that M.M.'s running behavior decreased when he would spend part of the school day in her classroom. Tr. 298:3–5; 300:9–11. Ms. Roman kept a chart beginning on November 2, 2015, which was his first full day in her classroom. Ex. 46 at 7. The chart shows that M.M. was running from the class numerous times beginning on November 2, but by the first week of December he did not run from the classroom at all. *Id.*; *see also* Tr. 300–301. In January 2016, M.M. ran from the classroom only once. Ex. 46 at 8; Tr. 301:8–10. Because Parents removed M.M. from school on February 3, 2016, data collection regarding his running behavior necessarily stopped.

In sum, the Court agrees with APS that the DPHO erred in concluding the failure to complete a Functional Behavioral Assessment and a Behavior Intervention Plan denied a FAPE. To make such a finding, the DPHO had to improperly ignore a significant amount of evidence that M.M.'s teachers were working to implement strategies to eliminate the running behavior, and that by the time he was removed from school, there were not any incidents of him running out of the classroom.

## V.  Progress in Light of M.M.'s Circumstances

The final dispute turns on whether M.M.'s IEP aimed so low that it amounted to M.M. sitting in school without meaningful attainment, as Parents assert, or whether his IEP was appropriately ambitious in light of his unique challenges. *See Endrew F.*, 137 S.Ct. at 1001. APS contends the May 2015 IEP set forth appropriately challenging goals for M.M. in light of his needs as a student with autism and global developmental delay, and there is evidence that M.M. made appropriate progress for a student with such significant disabilities. The crux of

APS' argument is that even if M.M. improved under an alternative educational support system (such as the private, in-home instruction by Ms. Monaghan), this does not mean the IEP was inappropriate or unreasonable. APS states this is especially true in light of the fact that the DPHO did not identify a single goal in the IEP that was inappropriate, nor did she make any changes to any of the goals in the IEP.[12] APS asserts that under *Endrew F.*, the May 2015 IEP established goals that were appropriately ambitious for M.M. in light of his circumstances as a student with autism *as well as* other developmental delays. *See Endrew F.*, 137 S. Ct. at 1001 ("The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created.").

In response, Parents counter that APS is relying on low expectations as being a good match for M.M. because of his dual diagnoses of autism and global developmental delay. Parents repeat their argument that M.M.'s lack of engagement, including running out of the classroom, was not systematically addressed by APS, thus APS denied a FAPE to M.M. Parents also again contend APS lacked data on M.M.'s engagement and activities and data is the bedrock of research-based strategies to effectively address learning for students with autism.

The Court finds that the administrative record does not support the DPHO's conclusion that M.M. was not making any progress under the programming APS developed for him. The preponderance of the evidence shows that APS took into consideration the fact that M.M. is a student with autism *as well as* significant global developmental delay and developed an IEP that appropriately addressed these disabilities. Ms. Monaghan, M.M.'s private therapist, testified that M.M. is not like a typical student with autism, and the record is brimming with evidence that he

---

[12] Notably, the DPHO did not agree with Parents that M.M.'s placement in the ISP classroom was inappropriate. In fact, the DPHO found M.M. did not fit perfectly in the ISP classroom or the Emerging Autism classroom. However, the DPHO nonetheless found APS denied FAPE to M.M. because his IEP was not calculated to provide him with educational benefit in the ISP classroom.

takes a tremendous amount of time to make progress toward even the smallest goals. Tr. 507:10–19; 1128:24–1129:8; 1405:3–17; Ex. 24 at 6. Thus, in light of these unique circumstances, the Court finds M.M. was making some meaningful progress, even if it was not the exact type of progress that Parents would have wanted. *See Endrew F.*, 137 S. Ct. at 998 (quoting *Rowley*, 458 U.S. at 192) ("[T]he IDEA cannot and does not promise "any particular [educational] outcome.'").

For example, Ms. Roman testified that by the end of January 2016, M.M. was able to sit and work for 30 to 45 minutes in the classroom, which was "progress" and "a big change," and something he was not able to do at the beginning of the school year. Tr. 340:4 –11; *see also* 258:18–23. In addition, M.M. was learning discrimination skills during the 2015–2016 school year, as part of Picture Exchange Communication System. Tr. 1373:10–18. Ms. Monaghan even agreed that M.M. was not ready to progress beyond the discrimination phase. Tr. 725. There is also evidence M.M. was making steps toward learning his visual schedule. *See* Tr. 1252–53.

Furthermore, the 2015 IEP mathematics goal stated that in a year's time, in a small group situation M.M. will sort three functional items with partial physical prompt as observed by teacher observation and data collection. Ex. 28 at 7. Ms. Roman explained that in working toward this mathematics goal, she closely worked with M.M. on sorting and matching a fork, spoon, and knife. Tr. 248; 251; 320:12–25. She explained that M.M. made progress on his math goal objectives and was able to pay attention and to work toward the goal or sorting the objects into their correct boxes with "minimal prompting." Tr. 320:12–23. *See also* Tr. 325–30 (Ms. Roman describing M.M.'s progress with his visual schedule and with learning Picture Exchange Communication System). These observations from M.M.'s educators show that, whether based

on observation or data, M.M. advanced in numerous areas. The DPHO did not consider or balance any of this evidence, so her conclusion that M.M. made no progress relative to his profound disabilities is flawed.

Parents are unhappy with the IEP because they feel M.M. did not make the same type of progress in his ISP classroom that he made at home under the instruction of Ms. Monaghan. The Court agrees with APS that the fact Parents are more satisfied by the progress M.M. made with Ms. Monaghan does not mean the IEP was inappropriate, especially in light of the evidence discussed above that Applied Behavior Analysis in the home is not the same as it is in the classroom setting. "The FAPE promised to students in the IDEA is not a perfect or ideal education." *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 563 (E.D. Pa. 2013), *aff'd in part*, 581 Fed. Appx. 141 (3d Cir. 2014); *see also Thompson R2-J Sch. Dist. v. Luke P., ex rel. Jeff P.*, 540 F.3d 1143, 1151 (10th Cir. 2008) ("In other words, Congress established procedures to guarantee disabled students access and opportunity, not substantive outcomes."). As a whole, M.M. made progress that was meaningful in view of his combination of disabilities. Although the DPHO found it to be concerning, for example, that M.M. did not "look at pictures meaningfully" with the SLP and that he did not "spontaneously initiate any communication in the classroom," (Final Decision at 10–11, ¶ 24), whether a student has been afforded an opportunity for meaningful educational progress must be evaluated in light of the student's potential. In this case, the student is a child who has autism as well as a severe global developmental delay, and autism alone cannot explain his challenges. Ms. Monaghan explained that in her ten years' of private work with M.M., he was not always successful in using Picture Exchange Communication System. Tr. 714–15; *see also* 1375:17–23 (Ms. Bossow's testimony that students with autism often ebb and flow and make inconsistent progress). The educational

program must be appropriately ambitious in light of his circumstances, and the Court concludes the May 2015 IEP satisfied this directive. *See Endrew F.*, 137 S. Ct. at 999, 1001.

The Supreme Court in *Endrew F.* recently reiterated that the adequacy of an IEP turns on the unique attributes of the child for which it is created. The record is replete with evidence that M.M.'s unique struggles made him unlike most students with autism, and APS has proffered a "cogent and reasonable explanation" for M.M.'s IEP, which was "reasonably calculated" to enable him to progress. *Endrew F.*, 137 S. Ct. at 999, 1002. "[B]enefits obtainable by children at one end of the spectrum will differ dramatically from those obtainable at the other end, with infinite variations in between," *Endrew F.*, 137 S.Ct. at 999 (quoting *Rowley*, 458 U.S. at 202), so the IEP must be evaluated through the lens of the student's "present level of achievement, disability, and potential for growth." *Id.* It is true that "under the IDEA, courts must accord significant deference to the choices made by school officials as to what constitutes an appropriate program for each student." *Ridley*, 680 F.3d at 277. Moreover, underlying this entire dispute is a reality that the Court cannot ignore: Parents withdrew M.M. from school in the middle of the school year, well-before anyone could evaluate if M.M. met his IEP goals given the full year's opportunity in the ISP classroom. Under *Endrew F.*, an IEP must be reasonably calculated to allow the student to progress, but Parents decided their son had been deprived of a FAPE only halfway through the school year, without giving APS a chance to complete the educational programming it developed for M.M.

## VI.    Remaining Issues Regarding DPHO's Ordered Remedy

Because the Court has found in favor of APS on the alleged errors in the DPHO's findings regarding deprivation of a FAPE, the Court is of the opinion that the issues raised by

APS pertaining to the DPHO's ordered remedy (Doc. 22 at 20–28) no longer remain.[13]  To the extent that any such issues do remain, counsel shall notify the Court of which issues need to be addressed in light of the Court's present ruling.  Counsel shall be limited exclusively to arguments already raised in the parties' briefing that are not resolved by the Court's ruling in favor of APS.  This is not an invitation for additional briefing on any issue; the Court simply wishes to know if any issues remain that are not resolved by the Court's rulings contained in this Memorandum Opinion and Order.  To that end, counsel for APS is limited to the issues on pages 20 through 28 of its brief (Doc. 22).  Counsel for Parents shall similarly refer with specificity to the page number of APS' brief in which the issue has already been raised.  If counsel for either party does not direct the Court to a specific page number, the Court will not address the issue. **Counsel shall notify the Court of any remaining issues as to remedy within fourteen (14) days of the entry of this Order**.

## CONCLUSION

Based on the Court's review of the DPHO's Final Decision, and the Court's independent review of the administrative record which served as the basis for the Final Decision, the Court finds that the DPHO's findings and conclusions regarding the appropriateness of APS' services are erroneous.  Accordingly, the Court **REVERSES** the Due Process Hearing Officer's Final Decision on the denial of a FAPE to M.M. and **VACATES** the DPHO's ordered remedies as to the FAPE deprivation.

---

[13] As part of APS' alternative argument, APS maintains the DPHO's order violates IDEA's Least Restrictive Environment provision.  APS further argues that even if a remedy for Parents is appropriate, the DPHO's remedy exceeded her authority, is not tied to the record, and the DPHO improperly delegated her statutory authority to the IEP team to fashion relief for M.M.

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE